UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA

v.

STEVEN COOK,

        Defendant.

Crim. Action No. 23-cr-340 (TNM)

**MR. COOK'S MEMORANDUM IN AID OF SENTENCING**

*Good decisions come from experience.*

*Experience comes from making bad decisions.*

*- Mark Twain*

Steven Cook will be before the Court for sentencing on July 19, 2024, having accepted full responsibility for his conduct at the U.S. Capitol on January 6. Mr. Cook is, at his core, a hardworking person who has struggled with alcohol abuse, and whose young age and the surrounding mob frenzy contributed to his actions on that day. Mr. Cook is dedicated to overcoming his struggles with alcohol, leaning on his strong family support system, particularly his mother, Vicki, who is five years sober. Mr. Cook now lives with his mother and his brother and Vicki has been supporting his efforts to become sober himself and to stop his cycle of poor decision-making.

"To know him is to love him," is a sentiment shared by all those in his life. *See* Exhibit A, 19 letters from professional supervisors, friends, and family. Mr. Cook is a positive, gregarious, contributing member of society. He has a kind, lighthearted demeanor even while being exhausted from working three jobs and dealing with these impending consequences.

Mr. Cook has admitted that he assaulted officers on that terrible day. He has reflected on and is ashamed of his conduct, and he accepts his punishment for what he did, as outlined in his letter to the Court. *See* Exhibit B. However, counsel submits that Steven's youth—he turned 22 just one week before the events of January 6—and alcohol struggles at the time of his offense militate in favor of a sentence that does not include a period of incarceration. For the reasons that follow, a sentence of probation, with conditions such as home confinement and continued substance abuse counseling, is sufficient, but no greater than necessary, to achieve the goals of sentencing.

**I.     Procedural History**

Mr. Cook was arrested on September 18, 2023. He was ordered released, over the government's objection, with strict conditions of release following a detention hearing on September 21, 2023.

On October 2, 2023, the grand jury returned a seven-count indictment. Pursuant to the release order, Mr. Cook was restricted to a curfew and was directed to actively seek employment, which he did. In October 2023, Mr. Cook obtained his first of three current jobs; he obtained the other two in February 2024. This Court permitted him to work during curfew hours on the condition that he provide his schedule to pre-trial services in advance so his curfew could be adjusted based on weekly work schedule verification.[1] Additionally, the release order directed Mr. Cook to attend outpatient substance abuse therapy and counseling and to submit to substance testing. Mr. Cook has been fully compliant with strict measures of supervision for 10 months, submitting his weekly work schedule for verification and respecting his adjusted curfew, and attending counseling and drug treatment services, where the results of his tests have consistently been negative.

Mr. Cook accepts responsibility for his conduct, and he understands that he needs to accept the consequences of his actions in order to resume his positive path with his family. Accordingly, on March 22, 2024, he accepted responsibility by pleading guilty to two counts of 18 U.S.C. § 111(a)(1).

---

[1] Minute Order, 10/23/2023.

**II.     The sentencing factors support the requested sentence.**

U.S.C. § 3553(a) directs the Court to impose a sentence that is "sufficient, *but not greater than necessary*, to comply with" the purposes of sentencing. The relevant sentencing factors are discussed below.

**a. Mr. Cook's history and characteristics support the requested sentence.**

Steven Cook was born to Kenneth Cook and Vicki Allen in Rockville, Maryland, and is the youngest of their four children. He is now 25 years old. Steven's parents divorced two months after his birth because of his father's infidelity. Their divorce changed Steven's family dynamic entirely, with his mother finding support in alcohol and his father finding support in women. For approximately 13 years, Steven spent his childhood bouncing back and forth between his parents' homes, until moving in with his father due to his mother's alcohol abuse.

Despite his broken home, Steven grew up in a good community in Frederick, Maryland, and had a close relationship with his parents and siblings. Steven did well at Tuscarora High School, participating in the athletics program and founding and serving as the Vice President of a service organization called Backpack Buddies, where he delivered lunches to schoolchildren in need. After high school, Steven attended Salisbury University. He quickly sought out community by joining a fraternity and earning a spot on the university's football team. Steven attended Salisbury for three years, majoring in psychology and business. However, COVID-19 forced classes online and Steven was unable to adjust. He withdrew from Salisbury

in 2020 to pursue working opportunities but plans to one day return and finish his degrees.

Steven held a steady job, working at CHF Construction in Clarksville, Maryland, for three years. After that, he worked as the general manager for Coast Taco Bar in Hagerstown, Maryland, until the restaurant went out of business. Once on supervised release, Steven renewed his alcohol server safety certification and began working at Brewer's Alley in Frederick, Maryland. Additionally, Steven has worked as a bartender at Monocacy Brewing and a server at Chipotle for the past five months while continuing as a server and bartender at Brewer's Alley.

### i. *Mr. Cook's age at the time of the offense supports a downward variance.*

Steven is a young, hardworking man whose age and immaturity at the time of the offense bears on his culpability because, "there is a growing recognition that people may not gain full reasoning skills and abilities until they reach age 25 on average."[2] Studies on brain development in adolescents by the National Institutes of Health show that the prefrontal cortex, the "executive" part of the brain important for controlling reason, organization, planning, and impulse control, and the region of the brain that inhibits risky behavior do not fully form until approximately age 25.[3] Before the brain is fully developed, there is a tumultuous stage of brain development

---

[2] USSC, Youthful Offenders in the Federal System, Fiscal Years 2010 to 2015 (2017), https://www.ussc.gov/sites/default/files/pdf/research-andpublications/research-publications/2017/20170525_youthful-offenders.pdf.

[3] *See* Jay N. Giedd, Structural Magnetic Resonance Imaging of the Adolescent Brain, 1021 Annals N.Y. Acad. Science 105-09 (June 2004); Elizabeth Williamson, Brain Immaturity Could Explain Teen Crash Rate, , Feb. 1, 2005, at A01.

5

when the limbic system (the areas of the brain responsible for detecting external threats and generating emotions, including the "fight or flight response") is overstimulated by sex hormones such as testosterone, while the prefrontal cortex (the portion of the brain responsible for impulse control and reasoning) is still immature and undergoing extensive reorganization.[4]  The imbalance and inconsistent coordination between these two areas of the brain, which persists well into the mid-20s, makes young people more prone to risky behavior and less capable of making rational decisions when they are emotionally aroused.[5]

The Supreme Court has found young people "have diminished culpability and greater prospects for reform." *Miller v. Alabama*, 567 U.S. 460, 471 (2012); *see also Roper v. Simmons*, 543 U.S. 551, 569–70 (2005).  This is because developments in psychology and brain science have shown juveniles (1) "have a lack of maturity and underdeveloped sense of responsibility, leading to recklessness, impulsivity, and heedless risk-taking"; (2) "are more vulnerable to negative influences and outside pressures, including from their family and peers," "have limited control over their own environment and lack the ability to extricate themselves from horrific, crime-producing settings"; and (3) possess character traits that are "less fixed" than those of an adult. *Miller v. Alabama*, 567 U.S. 460, 471 (2012) (quotation marks and citations omitted).

---

[4] *See* Laurence Steinberg, Age of Opportunity: Lessons from the New Science of Adolescence 69–72 (2014); Mariam Arain et al., Maturation of the Adolescent Brain, 9 Neuropsychiatric Disease & Treatment 449, 451–55 (2013).
[5] Steinberg, *supra* note 4, at 77.

In determining an adequate sentence, this Court should take into account the understanding among experts that the brain of a 22-year-old boy is different from that of the adults this Court more commonly sentences.

### B. The nature and circumstances of the offense support the requested sentence.

In addition to the consideration of his young age, this Court should also consider that Steven Cook's conscience and values were overcome by the larger group's emotions. Steven has always longed for community, seeking it in his football team at Salisbury University and his fraternity. The same happened here when Mr. Cook joined the crowd at the Capitol. The mob mentality that influenced the crowd on January 6, 2021, does not excuse his actions, but the concept of groupthink and the research discussed should be considered as part of the circumstances of the offense under 18 U.S.C. § 3553(a).

Mr. Cook's actions on January 6 were the result of his choices. However, his "choices" can be directly linked to the idea of "groupthink." In 1970, psychologist Irving Janis coined the phrase "groupthink" to describe "a process in which a group can make bad or irrational decisions as each member of the group attempts to conform their opinions to what they believe to be the consensus of the group."[6] Groupthink often occurs when people are deeply involved in a group, sharing a strong feeling of solidarity and determined to maintain the group relationships, no matter the costs. Group members often behave at a maturity level well below what they ordinarily

---

[6] Robert Bejesky, The SSCI Investigation of the Iraq War: Part i: A Split Decision, 40 S.U. L. Rev. 1, 28 (2012).

would. "A man descends several rungs in the ladder of civilization . . . by the mere fact he forms part of an organized crowd. Isolated, he may be a cultivated individual: in a crowd, he is a barbarian - this is, a creature acting by instinct."[7] Regarding group behaviors, neurologist Sigmund Freud argued that people in groups exhibit a loss of individuality, focus their thoughts and feelings into the common direction, are overcome by the unconscious power of emotion rather than reason and judgment, and are compelled to immediately carry out their intentions and the intentions of the group.[8]

Group violence happens because individuals, whose conscience and values are overcome by the group's emotions, now look to the group leader as their moral compass.[9] Before the events of January 6, 2021, former President Donald Trump encouraged Americans to travel to Washington D.C. and attend the "Stop the Steal" rally. At this rally, claims that the 2020 Presidential election was stolen were repeated and action was encouraged. Representative Madison Cawthorn announced, "This crowd has some fight in it. ... The Republicans hiding and not fighting, they are trying to silence your voice."[10] Former President Trump addressed the crowd, saying

> And we fight. We fight like hell. And if you don't fight like hell, you're not going to have a country anymore . . . . So, we're going to, we're going to walk down Pennsylvania Avenue . . . . And we're going to the Capitol, and we're going to try and give them the kind of pride and boldness that

---

[7] Gustave Le Bon, *The Crowd: A Study of the Popular Mind* 12. (Norman S. Berg ed., 1968)
[8] Ravi Bhavanani, Ethnic Norms and Inter ethnic Violence: Accounting for Mass Participation in the Rwanda Genocide, 43 J. PEACE RES. 6, 653 (2006).
[9] Steve K. Baum, *The Psychology of Genocide: Perpetrators, Bystanders, and Rescuers*, Cambridge Univ. Press, 9, 199 (2008)
[10] Joseph Choi, *Former sheriff regrets supporting Madison Cawthorn after he 'inflamed' Capitol mob*, The Hill, Jan. 12, 2021

8

they need to take back our country . . .. So, let's walk down Pennsylvania Ave.[11]

Social scientists have long observed how individuals in crowds of like-minded people can act in ways they never would individually because the *crowd* lost control.[12] Often, their conduct cannot be connected to duress, mental illness, emotional upset, or any other mitigating conditions commonly recognized under criminal law; however, many crowd members have "fully internalized the beliefs and values" of the group leaders, influencing their conduct.[13] With leadership members encouraging people to fight on January 6, mob frenzy took over.

"One of the main factors of the groupthink theory consists of an 'illusion of invulnerability . . . [leading people to] ignore obvious danger, take extreme risk, and [be] overly optimistic.'"[14] Brian Levin, the director of the Center for the Study of Hate & Extremism at California State University, has found that anyone who is part of the group, no matter how weak their connection, can turn violent because the

---

[11] Associated Press, *Transcript of Trump's Speech at Rally Before US Capitol Riot*, U.S. News & World Report, Jan. 13, 2021, available at https://www.usnews.com/news/politics/articles/2021-01-13/transcript-of-trumps-speech-at-rally-before-us-capitol-riot.

[12] Associated Press, *Rioters blame 'mob mentality' for violence at the Capitol*, American Journal News, May 24, 2021, https://americanjournalnews.com/january-6-capitol-rioters-mob-mentality-defense/.

[13] Paul H. Robinson & Lindsay Holcomb, *Indoctrination & Social Influence as a Defense to Crime: Are We Responsible for Who We Are?*, Penn Carey Law: Legal Scholarship Repository (2021), https://scholarship.law.upenn.edu/faculty_scholarship/2153?utm_source=scholarship.law.upenn.edu%2Ffaculty_scholarship%2F2153&utm_medium=PDF&utm_campaign=PDFCoverPages.

[14] Kelley Tiffany, *Cheering Speech at State University Athletic Events: How Do You Regulate Bad Spectator Sportsmanship?*, 14 Sports Law. J. 111, 136 (2007) (quoting I.L. Janis & L. Mann, Decision Making: A Psychological Analysis of Conflict, Choice, and Commitment (1997)).

responsibility seems to spread among the group and a "cloak of anonymity" covers the whole.[15]

Research on the mob mentality of sporting fans supports the ideas that a cultivated individual can become so entrenched in the group's goals that he no longer makes the same decisions he would on his own. The mere existence of a crowd can empower the individual spectator and delocalize one's decision making. When the sports fan's emotions become charged, the atmosphere becomes volatile; dangerous riots happen, and the actions of the fans can quickly shift from impolite to illegal. Psychologists that have researched violent soccer fans believe, "violence and die-hard loyalty stems from positive emotions like passionate commitment to the group and the desire to belong."[16]

Police in Britain have had success stopping violence and rioting that often erupts during actual sporting events, identifying and removing key instigators at soccer games. However, as Fiona Hill, who served on the National Security Council in the Trump administration, noted, "It's hard when the person who was inciting it

---

[15] Rachel Wiener et al., *Desperate, angry, destructive: How Americans morphed into a mob*, The Washington Post, Nov. 9, 2021, at 8:00 a.m., https://www.washingtonpost.com/dc-md-va/2021/11/09/rioters-charges-arrests-jan-6-insurrection/.

[16] Margi Murphy, *Soccer fans have the same mentality as terrorists, study claims*, New York Post, Sept. 27, 2017, at 10:47 a.m., https://nypost.com/2017/09/27/soccer-fans-have-the-same-mentality-as-terrorists-study-claims/; *see* Martha Newsom, *Football, fan violence, and identity fusion*, 54 Int'l Rev. for the Socio. of Sports 431 (2019); *see also* Shirley Wang, *Sports Complex: The Science Behind Fanatic Behavior*, Ass'n for Psych. Sci., May 1, 2006, https://www.psychologicalscience.org/observer/sports-complex-the-science-behind-fanatic-behavior.

happens to be the sitting president of the United States . . . makes it a bit difficult for the police to extricate him."[17]

Under 18 U.S.C. § 3553, the court must consider the circumstances of the offen*se*. As discussed, research recognizes how an individual loses oneself in the crowd and often looks to the group leader for guidance. Groupthink can take over and violence easily ensue, as happened on January 6, 2021. In the Reginald Denny case of 1992, defendants were acquitted of their most serious charges after a psychiatrist explained how mob mentality took control, causing them to lose their normal control and resort to violence. Mob mentality was not used by their attorneys to excuse their actions. Rather, they urged the jury to consider that they were "caught up in the mob frenzy" when assigning their guilt. Similarly, the mob mentality that influenced the crowd on January 6, 2021, does not excuse their actions, but the concept of groupthink and the research discussed should be considered during sentencing.

### C. A sentence below what the government is seeking would avoid unwarranted disparities.

Of course, no two cases—even among those that arise from January 6—are identical. Counsel could parse through every case and find similarities and differences between Mr. Cook's conduct and others on January 6. Like many Jan. 6 defendants, he was subjected to a torrent of propaganda and lies that the election had

---

[17] Rachel Wiener et al., *Desperate, angry, destructive: How Americans morphed into a mob*, The Washington Post, Nov. 9, 2021, at 8:00 a.m., https://www.washingtonpost.com/dc-md-va/2021/11/09/rioters-charges-arrests-jan-6-insurrection/.

11

been stolen and that democracy was on the brink of collapse. Like hundreds of others, he engaged with police officers. But unlike the vast majority of January 6 protestors, he was barely old enough to legally drink. Unlike many, he did not pre-plan any attack. The following cases demonstrate that home incarceration is fair and reasonable and will avoid unwarranted disparity with other similarly situated cases.

### *United States v. Grayson Sherrill*, 1:21CR282 (TSC)

*United States v. Grayson Sherrill* serves as an apt comparison to Mr. Cook's case because Mr. Sherrill was also one of the youngest defendants sentenced for offenses arising out of January 6. On January 6, Mr. Sherrill was 21 years old. Like Mr. Cook, he was convicted under 18 U.S.C. §111(a). Mr. Sherrill, however, engaged in more culpable conduct than Mr. Cook. Specifically, as one rioter charged an officer, Mr. Sherrill violently swung and struck the officer with a metal pole.

*Footage showing Mr. Sherrill (in the red shirt) swinging a metal pole and striking an officer.*





*Pole striking officer.*

Mr. Sherrill then entered the Capitol building and roamed around for 34 minutes, joining a group of protestors in chanting: "NANCY! NANCY!" Following January 6, Mr. Sherrill deleted videos from his cell phone that he took at the Capitol.[18] Recognizing that Mr. Sherrill was young at the time of the offense, the Honorable Tanya S. Chutkan imposed a sentence of **7 months incarceration**, notwithstanding the government's request for 41 months.

### *United States v. Matthew Council,* **1:21CR207 (TNM)**

Matthew Council's case also serves as a good comparator to this case. Mr. Council, also convicted under 18 U.S.C. § 111(a)(1), rammed into a line of police officers. He later made his way up to the Senate Wing door—despite being pepper sprayed—and struck his fist on the pane of the door for about two minutes.

---

[18] *United States v. Grayson Sherrill*, 21CR282 (TSC), Gov. Sentencing Memo, ECF. No. 124.



*Mr. Council screaming at police after being pepper sprayed.*



After being pepper sprayed, Mr. Council entered the building, where he claimed to have encouraged others to steal a laptop. Unlike Mr. Cook, Mr. Council was active on social media after January 6 and was an outspoken advocate for overthrowing the government.[19] This Court rejected the government's request for a lengthy period of incarceration and imposed **60 months of probation** instead.

---

[19] *United States v. Matthew Council*, 21CR207 (TNM), Gov. Sentencing Memo, ECF. No. 64.

*United States v. Phillip Young*, 1:21CR617 (DLF)



Defendant Phillip Young was also convicted under 18 U.S.C. § 111(a)(1) for rushing upstairs toward a police line and, along with several other protestors, lifting a barricade off the ground and pushing it toward police officers. When the group was unable to breach the security line the first time, Mr. Young tried again and pushed the barricade toward police officers a second time.

After assaulting officers with the barricade, Mr. Young let the air out of the tires of a government vehicle parked on Capitol grounds. When he was later interviewed by the FBI, Mr. Young said that he laughed at an officer when the officer told him to back down. He claimed his purpose in going to the rally on January 6 was for a last "joy ride."[20] This Court imposed a sentence of **8 months**, notwithstanding the government's request of 30 months.

The above cases show that a sentence of probation with home confinement would be consistent with sentences imposed in 111(a) cases in which the defendant

---

[20] *United States v. Philip S. Young*, 21CR617 (DLF), Gov. Sentencing Memo, ECF. No. 35.

presented with mitigating circumstances, like Mr. Cook, who was extremely young with no prior criminal felony convictions.

**D. The requested sentence will achieve the goals of sentencing.**

Mr. Cook has been under strict terms of supervision for the past 10 months with perfect compliance. He is working three jobs and attending counseling and substance abuse treatment. Currently, Mr. Cook lives with his mother, who has been a rock for him and understands how hard, yet important, it is that Steven remains dedicated to his sobriety. Mr. Cook knows that his actions brought this cascade of consequences onto himself. However, a prison sentence exceeds what is needed to achieve the goals of sentencing.

Respectfully submitted,

A.J. KRAMER
FEDERAL PUBLIC DEFENDER

_____/s/_____
ALEXIS GARDNER
Assistant Federal Public Defender
625 Indiana Avenue, N.W., Suite 550
Washington, D.C.  20004