**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Case No. 23-CR-340 (TNM)** |
| **STEVEN COOK,** | |
| **Defendant.** | |

<u>**GOVERNMENT'S SENTENCING MEMORANDUM**</u>

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Steven Cook to 37 months' imprisonment, three years of supervised release, $2000 in restitution and a $200 special assessment.

## I.       INTRODUCTION

The defendant, Steven Cook, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.9 million dollars in losses.[1]

---

[1] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States Capitol was $2,923,080.05. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police. The Metropolitan Police Department ("MPD") also suffered losses as a result of January 6, 2021, and is also a victim. MPD recently submitted a total of approximately $629,056 in restitution amounts,

Cook, a 25-year-old former college football player, joined the mob storming the West Front of the U.S. Capitol on January 6, 2021. Shortly after rioters broke the police line at the West Front, Cook pushed officers, grabbed an officer's baton, and hit multiple officers with a closed fist. Cook continued his violent rampage, traveled to the Lower West Tunnel, and actively participated in one of the most prolonged, violent assaults on law enforcement during the January 6 riots. While at the Lower West Tunnel, Cook took a mask from a nearby rioter, put it on his face and bull-rushed into the tunnel head-first in an attempted to break another police line. Cook left and returned to tunnel at least three times—spending over an hour at the tunnel, engaging in violence, assaulting officers, and impeding their ability to secure the U.S. Capitol. Shortly after January 6, Cook minimized his conduct, claiming he advised other rioters to stop the violence.

The government recommends that the Court sentence Cook to 37 months of incarceration for his conviction of violating 18 U.S.C. § 111(a) (Counts Two and Three). A 37-month sentence reflects the gravity of Cook's conduct, but also acknowledges his early admission of guilt.

## II.    FACTUAL BACKGROUND

### A.    The January 6, 2021 Attack on the Capitol

The government refers the court to the stipulated Statement of Offense filed in this case, ECF No. 21, for a short summary of the January 6, 2021 attack on the United States Capitol by hundreds of rioters, in an effort to disrupt the peaceful transfer of power after the November 3,

---

but the government has not yet included this number in our overall restitution summary ($2.9 million) as reflected in this memorandum. However, in consultation with individual MPD victim officers, the government has sought restitution based on a case-by-case evaluation.

2020 presidential election.

**B.      Cook's Role in the January 6, 2021 Attack on the Capitol**

***Approach to the Capitol***

Cook, violently participated in the January 6 attack on the Capitol. His crimes are documented through a series of videos provided to the FBI by concerned citizens, body worn cameras from the Metropolitan Police Department, open-source video, and surveillance footage from the Capitol.

At the Capitol, Cook joined the violent mob as they invaded the Capitol and delayed the certification of the electoral college vote.

Once Cook was on the U.S Capitol grounds, he walked on the West Plaza to the Lower West Terrace and eventually entered the Lower West Tunnel. Cook took several pictures of his presence on the Capitol grounds and posted it on his Snapchat account. *See* Images 1 and 2.



*Images 1 and 2: Screenshots from Cook's Snapchat Account (timestamp at 20 seconds and 34 seconds)[2]*

---

[2] See attached video – Exhibit A.

### *Assault of Metropolitan Police Department Officer J.M.*

While on the West Plaza near the Inauguration stage, Cook pushed and hit multiple police officers, moments after riots broke the police line. At approximately 2:28 p.m., Cook pushed Metropolitan Police Officer J.M. as he was trying to reestablish the police line and keep rioters from further breaching the Capitol. *See* Image 3.



*Image 3: Still Image from Officer J.M.'s Body Worn Camera at Approximately 2:28 p.m[3].*

Immediately thereafter, grabbed Officer J.M.'s police baton (*see* Image 4) and punched an unidentified police officer while rioters around him break the previously established police line (*see* Image 5).

---

[3] See attached video – Exhibit B (timestamp 14:28:39)



*Image 4: Still Image from MPD Officer J.M's Body Worn Camera at approximately 2:28 p.m.[4]*



*Image 5: Still Image from BWC at approximately 2:28 p.m Depicting Cook Punching an Officer[5]*

---

[4] See Exhibit B (timestamp 14:28:46)
[5] See Exhibit C (timestamp 14:28:48)

***Assaults on Officers at the Lower West Tunnel***

Cook continued his rampage to the Lower West Tunnel where he assaulted more officers who were trying to hold a another line at a pivotal entry point to the Capitol building. Cook returned to the tunnel three different times and spent over an hour assaulting officers in and near the Tunnel.

At approximately 2:43 p.m. Cook arrived at the Tunnel and immediately pushed himself into the mouth of the tunnel close to the police line in front of him. *See* Image 6. While he was in the Tunnel, Cook aided the attack on the police line protecting entry into the Capitol building by passing a pole to other rioters located deeper in the Tunnel. Cook left the tunnel at approximately 2:52 p.m.



*Image 6: Still Image From CCTV at Approximately 2:45 p.m. Depicting Cook Inside the Tunnel Passing a Pole[6]*

Second, at approximately 3:02 p.m., Cook returned to the tunnel. This time he took at gas

---

[6] See attached video – Exhibit D (timestamp 2:49:39 pm)

mask from a nearby rioter, put it on his face, and ran in the tunnel, bull rushing officers. *See* Images 7-8. At approximately 3:03 p.m. Cook pushed into the police line inside the tunnel and grabbed an officer's baton. *See* Exhibit E (timestamp 3:20:47 pm).



*Image 8: Still Image from BWC of Cook With Gas Mask Pushing Into Officers Inside the Tunnel at Approximately 3:03 p.m.*[7]

Between 3:02 p.m. and 3:05 p.m., while in the Tunnel, Cook grabbed an officer's baton, removed his gas mask, and continually pushed himself into officers in efforts of breaking the line. At approximately 3:05 p.m., Cook left the Tunnel.

At approximately 3:55 p.m., Cook returned to the mouth of the Tunnel, and soon thereafter, began pushing multiple times against police line in unison with other rioters. *See* Image 9. At

---

[7] See attached video – Exhibit F (timestamp 15:03:21)

approximately 4:08 p.m., Cook left the Tunnel area.



Image 9: Still Image From CCTV Depicting Cook Pushing Officers at the Tunnel at Approximately 3:55 p.m.[8]

### *Defendant's Statements*

On January 20, 2021, Cook was interviewed by the FBI about his conduct at the Capitol. He admitted that he saw tear gas in the air and also saw rioters using pepper spray while on the Capitol grounds. Cook admitted to seeing rioters trying to get inside the Capitol building and officers blocking the rioters from entering. Cook also observed rioters use an object to break a door of the Capitol building. Cook admitted to moving away from the Capitol building only after tear gas was being used against him. Cook did not admit to any violent conduct on January 6. Instead, Cook indicated that he asked people to stop and he encouraged people to leave. The

---

[8] See attached video – Exhibit G (timestamp 3:55:23 pm)

government has no evidence to support this statement, however his violent conduct of punching, hitting, grabbing, and pushing officers show a distinct contrast to his statement.

## III.    THE CHARGES AND PLEA AGREEMENT

On September 27, 2023, a federal grand jury returned an indictment charging Cook with seven counts, including, two counts of 18 U.S.C. § 111(a)(1), Assaulting, Resisting or Impeding Certain Officers. On, March 21, 2024, Cook was convicted of two counts of 18 U.S.C. § 111(a)(1) based on a guilty plea entered pursuant to a plea agreement.

## IV.    STATUTORY PENALTIES

Cook now faces sentencing on two counts of 18 U.S.C.§ 111(a)(1).

As noted by the plea agreement and the Presentence Report issued by the U.S. Probation Office, the defendant faces up to 8 years of imprisonment, a term of supervised release of not more than three years, a fine up to $250,000, restitution, and a mandatory special assessment of $100 for each felony conviction.

## V.    THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007). That Guidelines analysis follows:

Counts Two and Three: 18 U.S.C. § 111(a)(1)

| | | |
|---|---|---|
| U.S.S.G. § 2A2.2(a)[9] | Base Offense Level | 14 |
| U.S.S.G. § 3A1.2(b) | Official Victim | +6 |

---

[9] By cross-reference from U.S.S.G. § 2A2.4(c)(1) (Obstructing or Impeding Officers), which directs that Section § 2A2.2 (Aggravated Assault) be applied if the conduct constituted aggravated assault.

|  | **Total** | **20** |
|---|---|---|

| | |
|---|---|
| **Combined Offense Level** (U.S.S.G. § 3D1.4) | **22** |
| Acceptance of responsibility (U.S.S.G. §3E1.1) | <u>-3</u> |
| **Total Adjusted Offense Level:** | **19** |

*See* Plea Agreement at ¶¶ 5(A).

The U.S. Probation Office calculated the defendant's criminal history as category II, which is not disputed. PSR ¶ 67. Accordingly, based on the government's calculation of the defendant's total adjusted offense level, after acceptance of responsibility, at 19, Cook's Guidelines imprisonment range is 37 to 41 months' imprisonment.[10]

## VI.    SENTENCING FACTORS UNDER 18 U.S.C. § 3553(A)

In this case, sentencing is guided by 18 U.S.C. § 3553(a). As described below, on balance, the Section 3553(a) factors weigh in favor of a lengthy term of incarceration.

### A.    Nature and Circumstances of the Offense

As shown in Section II(B) of this memorandum, Cook's felonious conduct on January 6, 2021 was part of a massive riot that almost succeeded in preventing the certification vote from being carried out, frustrating the peaceful transition of Presidential power, and throwing the United States into a Constitutional crisis. Specifically, Cook repeatedly assaulted officers throughout multiple areas of the restricted grounds, joined the fight in the Tunnel three separate times,

---

[10] Cook's plea agreement contains a Guidelines range estimate of 30 to 37 months' imprisonment (*See* Plea Agreement ¶ 5D), but, at the time the agreement was reached, the government was unaware of Cook's 2023 DUI conviction and the sentence imposed for Cook's 2021 DUI conviction. *See* PSR ¶¶ 64, 66. Nevertheless, the government's recommendation of 37 months' imprisonment still falls within the estimated guideline range in the plea agreement.

remaining in the tunnel area for over an hour, helped arm other rioters, and used a gas mask to protect himself during his Tunnel rampage. The nature and circumstances of Cook's offenses were of the utmost seriousness, and fully support the government's recommended sentence of 37 months' imprisonment.

### B.  The History and Characteristics of the Defendant

Cook is currently a bartender working in Maryland. PSR ¶ 102. He has a history of arrest and conviction which weighs in favor of a lengthy period of incarceration:

- In June 2021, the defendant was charged with Driving Vehicle Under Influence of Alcohol. He was convicted and sentenced to 1 year of unsupervised probation. The defendant violated his probation as he was arrest and later convicted of Driving While Impaired in 2023. PSR ¶ 64.

- In May 2023, the defendant was charged with Driving While Impaired. He was convicted and sentenced to 60 days' jail, suspended and 3 years unsupervised probation. PSR ¶ 66.

Cook's crimes on January 6 were not an isolated event in an otherwise law-abiding life. After January 6, Cook continued to commit other crimes and disregard the law During his interview with probation, Cook did not report substance abuse issues, but the substance abuse issue are apparent from his prior convictions and his failed urine tests while release.His criminal history is concerning, particularly in light of his lack of acknowledgement of substance abuse issues and his  disregard for  the law. *See* PSR ¶¶ 64, 93-96. The defendant's history and characteristics, including his history of arrest, conviction, and failure to adhere to court's orders, weigh heavily in favor of a term of incarceration.

**C.     The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law**

As with the nature and circumstances of the offense, this factor supports a sentence of incarceration. Cook's criminal conduct on January 6 was the epitome of disrespect for the law.

**D.     The Need for the Sentence to Afford Adequate Deterrence**

*General Deterrence*

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C. § 3553(a)(2)(B). The need to deter others is especially strong in cases involving domestic terrorism, which the breach of the Capitol certainly was.[11] The demands of general deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol.

*Specific Deterrence*

The need for the sentence to provide specific deterrence to this particular defendant also weighs heavily in favor of a lengthy term of incarceration.

Since January 6, Cook has not shown remorse for his actions. During his interview with the FBI, Cook made no mention of his assaultive conduct and completely minimized his actions at the Capitol. After January 6, Cook was charged with two additional crimes, showing a clear disregard for the law.

On March 23, 2024, two days after Cook pled guilty, Cook posted an article titled "Frederick Man Pleads Guilty to Assaulting Police During Jan. 6 Attack," along with his comment,

---

[11] *See* 18 U.S.C. § 2331(5) (defining "domestic terrorism").

"Trying to keep us patriots quiet." PSR ¶ 83. His statements and conduct after January 6 show a clear disregard for the law and demonstrates that this defendant's sentence must be sufficient to provide specific deterrence from committing future crimes of violence.

### E.     The Importance of the Guidelines

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007). As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007) (quoting *Rita*, 551 U.S. at 349); 28 U.S.C. § 994(m). In so doing, the Commission "has the capacity courts lack to base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise," and "to formulate and constantly refine national sentencing standards." *Kimbrough*, 552 U.S. at 108 (cleaned up). Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101.

### F.     Unwarranted Sentencing Disparities

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar *conduct*" (emphasis added). So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted

disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007).

Section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a). After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095. "As the qualifier 'unwarranted' reflects, this provision leaves plenty of room for differences in sentences when warranted under the circumstances." *United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013).[12] "When an offense is uniquely serious,

---

[12] If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than overstate the severity of the offense conduct. *See United States v. Knutson*, D.D.C. 22-cr-31 (FYP), Aug. 26, 2022 Sent. Hrg. Tr. at 24-25 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (statement of Judge Pan).

courts will consider the need to impose stiffer sentences that justify the risk of potential disparities." *United States v. Mattea*, 895 F.3d 762, 768–69 (D.C. Cir. 2018) (cleaned up).

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences.[13] While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the conduct in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

In *United States v. Cale Clayton*, 22-cr-139 (RCL), the defendant plead guilty to two assault counts under 18 U.S.C. § 111(a)(1). The court sentenced the defendant to 30 months' imprisonment for taunting, shoving, and assaulting officers on the Upper West Terrace. Clayton's guidelines range was lower than Cook's due to a criminal history category of I. However, like *Clayton*, Cook assaulted multiple officers, antagonized officers, and continued his rampage throughout the restricted grounds.

In *United States v. Michael Mackrell*, 21-cr-276 (CKK), the defendant was one of the most violent January 6 offenders, assaulting several officers while on the Capitol grounds. The court sentenced the defendant to 27 months' imprisonment for his conduct. Mackrell's guidelines range was lower than Cook's due to a criminal history category of I and a plea to a single count of Section

---

[13] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

111(a). However, like Mackrell, Cook assaulted several officers and was one of the most violent offenders on January 6.

## VII.   RESTITUTION

The Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011); *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA).[14] Generally, restitution under the VWPA must "be tied to the loss caused by the offense of conviction," *Hughey v. United States*, 495 U.S. 411, 418 (1990); identify a specific victim who is "directly and proximately harmed as a result of" the offense of conviction, 18 U.S.C. § 3663(a)(2); and is applied to costs such as the expenses associated with recovering from bodily injury, 18 U.S.C. § 3663(b). At the same time, the VWPA also authorizes a court to impose restitution "in any criminal case to the extent agreed to by the parties in a plea agreement." *See* 18 U.S.C. § 3663(a)(3). *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

Those principles have straightforward application here. The victims in this case, Officer J.M. and another unidentified officer, did not suffer bodily injury as a result of Cook's assault. The parties agreed, as permitted under 18 U.S.C. § 3663(a)(3), that Cook must pay $2,000 in restitution,

---

[14] The Mandatory Victims Restitution Act, Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA, *Papagno*, 639 F.3d at 1096, including crimes of violence, "an offense against property … including any offense committed by fraud or deceit," "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss." 18 U.S.C. § 3663A(c)(1).

which reflects in part the role Cook played in the riot on January 6.[15] Plea Agreement at ¶ 12. As the plea agreement reflects, the riot at the United States Capitol had caused "approximately $2,923,080.05" in damages, a figure based on loss estimates supplied by the Architect of the Capitol and other governmental agencies as of July 2023. *Id.* (As noted above in footnote 1, the amount of damages has since been updated by the Architect of the Capitol, USCP, and MPD.) Cook's restitution payment must be made to the Clerk of the Court, who will forward the payment to the Architect of the Capitol and other victim entities. *See* PSR ¶ 143.

## VIII.   FINE

The defendant's convictions for violations of two counts of 18 U.S.C. § 111(a)(1) subject him to a statutory maximum fine of $250,000. *See* 18 U.S.C. § 3571(b). In determining whether to impose a fine, the sentencing court should consider the defendant's income, earning capacity, and financial resources. *See* 18 U.S.C. § 3572(a)(1); *See* U.S.S.G. § 5E1.2(d). The sentencing guidelines require a fine in all cases, except where the defendant establishes that he is unable to pay and is not likely to become able to pay any fine. U.S.S.G. § 5E1.2(a) (2023). Here, the Cook's financial assets set forth in the PSR suggest that the defendant is unable, and is unlikely to become able, to pay a fine.

---

[15] Unlike under the Sentencing Guidelines for which (as noted above) the government does not qualify as a victim, *see* U.S.S.G. § 3A1.2 cmt. n.1, the government or a governmental entity can be a "victim" for purposes of the VWPA. *See United States v. Emor*, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).

IX.     **CONCLUSION**

For the reasons set forth above, the government recommends that the Court impose a sentence of 37 months' imprisonment, three years of supervised release, $2000 in restitution and a $200 special assessment.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By:    _Nialah S. Ferrer_

       _____
NIALAH S. FERRER
Assistant United States Attorney
New York Bar No. 5748462
United States Attorney's Office
District of Columbia
(202) 557-1490
nialah.ferrer@usdoj.gov